UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SAC FUND II 0826, LLC,

                      Plaintiff,

                      -against-

BURNELL'S ENTERPRISES, INC., AMERICAN BUG CO., INC., a/k/a AMERICAN BUG COMPANY, INC., RONALD BASSETT as EXECUTOR OF THE ESTATE OF ADELL D. BASSETT, RONALD BASSETT, individually, NEW YORK CITY DEPARTMENT OF FINANCE, NEW YORK CITY ENVIRONMENTAL CONTROL BOARD, AMERICAN EXPRESS CENTURION BANK, and "JOHN DOE NO. I" to "JOHN DOE NO. XXX," inclusive, the last thirty names being fictitious and unknown to plaintiff, the persons or parties intended or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint,

                      Defendants.
------------------------------------------------------------- x

**REPORT AND RECOMMENDATION**

18-CV-3504 (ENV) (PK)

**Peggy Kuo, United States Magistrate Judge:**

      On November 15, 2019, a default judgment of foreclosure was entered in favor of SAC Fund II 0826, LLC ("SAC Fund II" or "Plaintiff") against Burnell's Enterprises, Inc. ("Burnell's"), American Bug Company, Inc. ("American Bug"), and Ronald Bassett, individually and as the Executor of the Estate of Adell D. Bassett (collectively "Defendants").[1]  (Judgment, Dkt. 35.)  Plaintiff was also granted the right to seek a deficiency judgment against Defendants and leave to submit evidence to

---

[1] Default judgment was also entered against American Express Centurion Bank ("American Express"), but because Plaintiff does not seek a deficiency judgment against American Express, this Report and Recommendation does not address that defendant.

1

establish the amounts currently due and owing to it, along with a proposed Judgment of Foreclosure and Order of Sale. *Id.*

Before the Court now are Plaintiff's request for accounting (*see* Memorandum Supporting Plaintiff's Accounting ("Pl. Mem."), Dkt. 36) and Plaintiff's proposed Judgment of Foreclosure and Sale ("Proposed Judgment," Dkt. 36-4).

For the reasons stated below, the undersigned respectfully recommends that Plaintiff be granted a deficiency judgment in the amount of $3,407,152.44 and awarded reasonable attorneys' fees and costs in the amount of $94,371.29.

## BACKGROUND

The facts of this case are set forth in the Default Judgment Report and Recommendation ("Default R&R," Dkt. 32) and incorporated here by reference.

After Plaintiff filed its request for accounting, the Court held a hearing by telephone on February 9, 2021. Defendants, who had not previously appeared in this case, made a "limited" appearance through counsel, while objecting to personal jurisdiction for deficient service. (Letter from Steven Alexander Biolsi dated Feb. 9, 2021, Dkt. 39.) In addition to making an oral request for leave to file a motion to vacate the default judgment, which was denied, Defendants requested permission to file a supplemental letter alerting the Court to recent case law in the New York Appellate Division relevant to the calculation of interest. (Minute Entry dated Feb. 9, 2021.) The Court granted permission to make that filing, and on February 19, 2021, Defendants filed a letter citing caselaw (Dkt. 44) and also filed a letter brief arguing that the Court should exercise its equitable powers to limit the interest recoverable by Plaintiff. (Dkt. 43.) On February 19 and February 24, 2021, Plaintiff's counsel responded to Defendants' letters. (Dkts. 45, 46.)

At the Court's request, Plaintiff submitted additional supplemental information on its calculations on July 6, 2021 (Dkt. 54) and on July 28, 2021. (Dkt. 57.)

2

## DISCUSSION

### I. Amounts Owed Under the Loan

Plaintiff requests a deficiency judgment for the total indebtedness under the loan, plus accrued interest, comprised of (1) the unpaid principal balance, (2) payments advanced by Plaintiff for water and taxes, (3) insurance payments made by Plaintiff, (4) prepayment premium, and (5) reasonable attorneys' fees and costs. (Pl. Mem. at 1.)

#### A. Unpaid Principal Balance With Interest

Plaintiff submitted a declaration from an operations specialist at Carver Federal Savings Bank ("Carver"), stating that the unpaid principal balance of the loan was $725,171.58 at the time the loan was accelerated on July 28, 2015. (Decl. of Nakeema Thomas ("Thomas Decl.") ¶¶ 1, 5-6, Dkt. 36-3.)[2]

Section 9.3 of the Consolidation, Modification and Extension Agreement ("CEMA")[3] sets forth a default interest rate of 24%, calculated from the date of default, to be imposed on the unpaid principal balance.

> Mortgagors will cause to be paid, from the date of an Event of Default through the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full, interest on the unpaid principal balance of the Note at a rate equal to twenty four percent (24.00%) per annum (the "Default Rate"), but not to exceed the maximum rate then allowed by applicable law. (CEMA Section 9.3, Ex. G to Compl., Dkt. 1-7 at 25; Dkt. 41 at 23 (legible copy).)

Burnell's, as the Borrower in the Restated Promissory Note, failed to make payments in connection with taxes that were due on April 1, 2012, thus defaulting. (Default R&R at 11; Thomas Decl. ¶ 7.) Pursuant to the CEMA, interest on the unpaid principal balance began accruing at that point at the

---

[2] Plaintiff also submitted a Statement of Loan Account from Carver, showing a principal balance on the mortgage of $782,655.15 as of May 2, 2014 (Decl. of Isaac Taub ("Taub Decl.") ¶ 5, Dkt. 54-1; Ex. B to Taub Decl., Dkt. 54-2); however, that is not the date on which the loan was accelerated or payments stopped being made. In any event, Plaintiff seeks $725,171.58 as the unpaid principal balance due. (July 14, 2021 Motion Hearing Transcript ("Tr.") at 3:16-5:15.)

[3] The undersigned employs the commonly used acronym despite the title of the document being slightly different.

Default Rate. (CEMA Section 9.3.)

Plaintiff acknowledges that Burnell's continued to make regular principal and interest payments between April 1, 2012 and April 15, 2015. (*See* Decl. of David Goldwasser ("Goldwasser Decl.") ¶6(a) n.2, Dkt. 36-2.) These regular loan payments included interest at a regular rate of 6% as set forth in the Note. (Ex. A to Compl., Restated Promissory Note ("Note"), Art. 2(II)). Giving credit for this payment of interest, Plaintiff reduced its interest calculation during the period between April 1, 2012 and April 15, 2015 by 6% from the Default Rate of 24% to 18%. (*See* Goldwasser Decl. ¶6(a) n.2.) Beginning on April 15, 2015, when Burnell's stopped making loan payments altogether, interest is calculated at the Default Rate of 24%. (*See id.* at ¶6(a); CEMA Section 9.3.)

The chart below shows the calculations for interest due up to and including May 13, 2022, the date of this Report and Recommendation. (*See* Supplemental Decl. of Isaac Taub ("Supp. Taub Decl.") ¶ 6, Dkt. 57.)

| Unpaid Principal Balance Interest | | | | | |
|---|---|---|---|---|---|
| Dates at this Rate | Interest Rate | UPB | Number of Days at this Rate | Per Diem Amount | Total Interest for this Period |
| April 1, 2012 to April 14, 2015 | 18% | $725,171.58 | 1,109 | $357.62 | $396,599.32 |
| April 15, 2015 to May 13, 2022 | 24% | $725,171.58 | 2,586 | $476.83 | $1,233,069.83 |
| | | | | **Total Interest Due:** | **$1,629,669.15** |

Accordingly, the unpaid principal balance due is **$725,171.58**, with accrued interest up to and including May 13, 2022 of **$1,629,669.15**, for a total of **$2,354,840.73**. The interest continues to accrue at a per diem rate of $476.83 until the full payment is made.

**B. Tax and Water Advances With Interest**

Plaintiff made several payments for tax and water bills related to the Properties from May 11, 2016 through April 29, 2021, totaling $498,415.17. (*See* Goldwasser Decl. ¶ 6(b); Supp. Taub Decl. ¶¶

4

8-10.) Such advances are recoverable as part of the debt that becomes due upon Defendants' default. (Note, Arts. 3(d) (the default debt includes "all sums advanced pursuant to the [CEMA] to protect and preserve [the] Property . . . and the lien and the security interest created thereby"), 6; Goldwasser Decl.; CEMA Section 2.1(d).)

In addition to recovering the money it advanced, Plaintiff is entitled, pursuant to the CEMA, to recover interest at the Default Rate of 24%, once it provides notice that such cost or expense was incurred. (CEMA Section 10.3 ("All such costs and expenses incurred by Lender . . . shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender.").)

Plaintiff sent three notices to Defendants that it paid water and tax advances: on June 2, 2016, for tax advances made on May 11, 2016 (Ex. C to Taub Decl., Dkt. 54-3); on March 9, 2020, for tax and water advances made on December 28, 2018, January 11, 2019 and February 8, 2019 (Ex. D to Taub Decl., Dkt. 54-4); and on July 14, 2021 for tax advances made on June 1, 2019, September 26, 2019, March 25, 2020, September 2, 2020, January 13, 2021, and April 29, 2021. (Supp. Taub Decl. ¶ 10; Ex. L to Supp. Taub Decl., Dkt. 57-3.) The advances paid by Plaintiff began to accrue interest at the Default Rate as of the date that notice of those payments was provided to Defendants. (*See* CEMA Section 10.3.)

For the time prior to providing notice to Defendants of payment, Plaintiff requests "18% interest on those advances based on the 18% interest rate charged for defaulted tax payments by the City of New York." (Goldwasser Decl. ¶ 6(b), n.3; *see* Tr. at 9:17-10:3.) Plaintiffs provide no support for charging any interest to Defendants prior to giving notice, and that amount should be denied.

The following chart sets forth the tax and water advances owed to Plaintiff and the applicable interest calculations up to and including May 13, 2022:

5

| Tax and Water Advances | | | | | | |
|---|---|---|---|---|---|---|
| Date of Payment | Amount Paid | Date of Notice | Interest Rate | Per Diem Amount | Days from Notice to May 13, 2022 | Accrued Interest |
| May 11, 2016[4] | $233,962.56 | June 2, 2016 | 24% | $153.84 | 2,172 | $334,137.00 |
| Dec. 28, 2018 | $42,456.96 | Mar. 9, 2020 | 24% | $27.92 | 796 | $22,221.86 |
| Jan. 11, 2019 | $47,182.32 | Mar. 9, 2020 | 24% | $31.02 | 796 | $24,695.10 |
| Feb. 8, 2019 | $19,212.11 | Mar. 9, 2020 | 24% | $12.63 | 796 | $10,055.57 |
| Feb. 8, 2019 | $14,009.57 | Mar. 9, 2020 | 24% | $9.21 | 796 | $7,332.57 |
| June 1, 2019 | $13,387.66 | July 14, 2021 | 24% | $8.80 | 304 | $2,676.06 |
| Sept. 26, 2019 | $1,975.45 | July 14, 2021 | 24% | $1.30 | 304 | $394.87 |
| Mar. 25, 2020 | $3,462.17 | July 14, 2021 | 24% | $2.28 | 304 | $692.05 |
| Sept. 2, 2020 | $15,167.55 | July 14, 2021 | 24% | $9.97 | 304 | $3,031.85 |
| Jan. 13, 2021 | $105,643.39 | July 14, 2021 | 24% | $69.46 | 304 | $21,117.10 |
| Apr. 29, 2021 | $1,955.43 | July 14, 2021 | 24% | $1.29 | 304 | $390.87 |
| Total Tax and Water Advances: **$498,415.17** | | | | | | |
| | | | | | Total Interest Due: | **$426,744.90** |

Accordingly, the amount due for water and tax advances is **$498,415.17**, with accrued interest up to and including May 13, 2022 of **$426,744.90**, for a total of **$925,160.07**. The interest on these payments continues to accrue at a combined per diem rate of $327.73 until full payment is made.

C. **Insurance Payments with Interest**

Plaintiff was permitted to obtain insurance coverage for the Properties and recover those costs with interest at the Default Rate.

> If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Mortgagors, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Mortgagors to Lender upon demand and until paid shall be secured by this Security Instrument and shall bear interest in accordance with Section 9.3 hereof. (CEMA, Section 3.3(f).)

---

[4] The Goldwasser Declaration includes an additional amount of $10,500.00, which Plaintiff acknowledged was included in error. (Taub Decl. ¶ 8; Supp. Taub Decl. ¶ 11, n.2.)

An invoice provided by Plaintiff's loan servicer shows that insurance advances totaling $21,340.12 were paid as follows: $6,580.94 on December 31, 2017; $8,040.72 on December 31, 2018; and $6,718.46 on September 4, 2019. (Taub Decl. ¶ 7; Ex. E to Taub Decl.) Notice was sent to Defendants on March 9, 2020, however, stating that insurance advances totaling $24,362.50 were paid: $9,621.18 on December 31, 2017; $8,040.72 was paid on December 31, 2018; and $6,700.60 was paid on September 4, 2019. (Ex. D to Taub Decl. at 3; *see also* Goldwasser Decl. ¶ 6(c) (repeating these numbers).) Upon review of the invoice, Plaintiff acknowledged that the amounts listed in the notice were incorrect. (Supp. Taub Decl. ¶ 7.) Accordingly, the lower amounts supported by the invoice are used to calculate the insurance payments made.

Although interest at the Default Rate began accruing as of the date of the notice to Defendants, Plaintiff has requested that an interest rate of 9% be applied to the insurance payments. (Goldwasser Decl. ¶ 6(c); Tr. at 8:5-25; Taub Decl. ¶ 7.)

| **Insurance Advances** | | | | | | |
|---|---|---|---|---|---|---|
| **Date of Payment** | **Amount** | **Date of Notice** | **Interest Rate** | **Per Diem Amount** | **Days to May 13, 2022** | **Accrued Interest** |
| Dec. 31, 2017 | $6,580.94 | Mar. 9, 2020 | 9% | $1.62 | 796 | $1,291.67 |
| Dec. 31, 2018 | $8,040.72 | Mar. 9, 2020 | 9% | $1.98 | 796 | $1,578.18 |
| Sept. 4, 2019 | $6,718.46 | Mar. 9, 2020 | 9% | $1.66 | 796 | $1,318.66 |

Accordingly, the amount due for insurance advances is **$21,340.12** with accrued interest up to and including May 13, 2022 of **$4,188.51**, for a total of **$25,528.63**. Interest on these payments continues to accrue at a per diem rate of $5.26 until full payment is made.

D. **Prepayment Premium**

Plaintiff requests a prepayment penalty of 5% of the total amount due, including the unpaid principal balance, tax and water advances, insurance premiums and all interest due on those amounts. (*See* Dkt. 54 at 4; Supp. Taub Decl. ¶ 11; Tr. at 16:13-17:24.)

7

The Note states that the borrower "may prepay the Principal Indebtedness in whole or in part," but that any such prepayment must be accompanied by a "prepayment charge" of a certain percentage of the prepaid amount, depending on the year in which the prepayment is made:

> each such prepayment shall be accompanied by the payment to Lender, its successors or assigns, of a prepayment charge equal to (a) five percent (5.00%) of the prepaid amount if prepayment is made within the first, sixth, eleventh, and/or sixteenth years after the date hereof, (b) four percent (4.00%) of the prepaid amount if prepayment is made within the second, seventh, twelfth and/or seventeenth years after the date hereof, (c) three percent (3.00%) of the prepaid amount if prepayment is made within the third, eighth, thirteenth and/or eighteenth years after the date hereof, (d) two percent (2.00%) of the prepaid amount if prepayment is made within the fourth, ninth, fourteenth and/or nineteenth years after the date hereof, and (e) one percent (1.00%) of the prepaid amount if prepayment is made within the fifth, tenth, fifteenth and/or twentieth years after the date hereof. Notwithstanding anything to the contrary contained herein, there shall be no prepayment penalty until such time as principal and interest payments shall be due under this Note. (Note, Art. 5.)

The CEMA describes a "Default Prepayment" as "a prepayment of the <u>principal</u> amount hereof made after the occurrence of any Event of Default or an acceleration of the Maturity Date…." (CEMA, Section 8.2 (emphasis added).) The CEMA further states that "If a Default Prepayment . . . occurs, Borrower shall pay to Lender the entire Debt, as if such payment were a voluntary prepayment referred to elsewhere herein." (CEMA, Section 8.2.) Notwithstanding that Defendants are required to pay the full amount of the debt upon default, the undersigned does not read this provision of the CEMA to require that Defendants pay a prepayment charge on the <u>non-principal</u> portions of the debt – that is, tax, water and insurance advances, and all interest.

Plaintiff contends that "Article 5 of the Note states that a 5% prepayment fee is due in the 16th year for the Loan; 2020 is the 16th year of the Loan." (Goldwasser Decl. ¶ 6(e) n.4; *see* Plaintiff's Supplemental Accounting, Dkt. 54 at 4 ("the year of the payoff … was assumed to be 2020 based on the March 2020 date of the accounting motion.")) However, because the date of the Note is October 1, 2005, March 2020 would be within the 15th year of the loan. According to the Note, a prepayment made in the 15th year incurs a prepayment charge of 1% of the prepayment amount. (Note, Art. 5.)

8

Accordingly, there is a prepayment charge of 1% of the principal balance, which is $725,171.58. One percent of that is $7,251.72.

### E. Reasonable Attorneys' Fees and Costs

The CEMA entitles Plaintiff to recover reasonable legal costs and reasonable attorneys' fees it incurred to protect its interest in the properties, including in bringing a foreclosure proceeding, plus interest at the Default Rate:

> Mortgagors shall pay to Lender on demand any and all reasonable expenses, including reasonable legal expenses and reasonable attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or Personal Property or in collecting any amount payable hereunder or in enforcing its rights hereunder, including by way of foreclosure proceeding, with respect to the Property or Personal Property, … together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Mortgagors. (CEMA, Section 18.2; *see also* Dkt. 54 at 2.)

The Note similarly requires the payment of reasonable attorneys' fees and costs:

> In the event that it should become necessary to employ counsel to collect the Debt or to protect or foreclose the security therefor, Borrower also agrees to pay all reasonable fees and expenses of Lender, including, without limitation, reasonable attorneys' fees and disbursements for the services of external or in-house counsel whether or not suit is brought. (Note, Art. 17.)

Plaintiff seeks to recover "attorneys' fees of $160,582.83, including unbilled work through March 27, 2020 in the amount of $14,460.00, and costs of $3,674.29." (Decl. of Jason Nagi ("Nagi Decl.") ¶ 11, Dkt. 36-1.)

In support, Plaintiff submitted an invoice dated March 19, 2020, showing attorney billing records for 384.8 hours from December 21, 2015 through February 28, 2020, with fees totaling $141,999.50. (Ex. 2 to Nagi Decl. ("Billing Records") at 20-56.) The invoice also shows costs expended from February 5, 2016 through January 31, 2020 totaling $3,674.29. (*Id.* at 57-61.)

"The court has discretion to determine the amount of attorneys' fees appropriate to satisfy a

9

fee award."[5] *Zuffa, L.L.C. v. South Beach Saloon, Inc.*, No. 15-CV-6355 (ADS)(AKT), 2019 WL 1322620, at *6 (E.D.N.Y. Mar. 6, 2019) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)), *R&R adopted*, 2019 WL 1317568 (E.D.N.Y. Mar. 22, 2019). "[T]he lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro-North R.R.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)), *superseded on other grounds as recognized in Acker v. Gen. Motors*, 853 F.3d 784, 790 (5th Cir. 2017).

"[A]bsent unusual circumstances[,] attorneys are required to submit contemporaneous records with their fee applications[ ]" to document the hours reasonably billed. *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010) (citing *New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136 (2d Cir. 1983) [hereinafter *Carey*]). Plaintiff provided contemporaneous time records for legal work performed from December 2015 to February 28, 2020. (*See* Billing Records.)

### 1. Reasonableness of the Attorneys' Hourly Rates

"Hourly rates in the Eastern District of New York generally range from $300.00 to $450.00 [per hour] for partners, $200.00 to $325.00 for senior associates, $100.00 to $200.00 for junior associates and $85.00 to $100.00 for paralegals." *CIT Bank N.A. v. Gordon*, No. 17-CV-3972(ADS)(SIL), 2020 WL 4587446, at *4 (E.D.N.Y. May 10, 2020), *R&R adopted*, No. 217-CV-3972(ADS)(SIL), 2020 WL 2711420 (E.D.N.Y. May 26, 2020). In a mortgage foreclosure case that does not involve any complex legal issues or require any high level of skill, the hourly rates are not awarded at the high end of range. *Id.* (reducing the hourly rate of a partner to $375, senior associate

---

[5] Plaintiff used DR 2-106 of the American Bar Association's Model Code of Professional Responsibility as guidance to show that their requested legal fees are reasonable. (Pl. Mem. at 2-8.) Although the Court's considerations for awarding attorneys' fees under DR 2-106 of the American Bar Association's Model Code of Professional Responsibility are similar to the Second Circuit's considerations for attorneys' fees, the undersigned applies the Second Circuit's legal standard for attorneys' fees to determine the reasonableness of the request. (*See* Dkt. 54 at 3.)

to $250, and paralegal to $90); *see also Eastern Savings Bank, FSB v. Strez*, No. 11-CV-1543 (ENV)(LB), 2013 WL 6834806, at *4 (E.D.N.Y. Dec. 20, 2013) ("Courts in this district routinely reduce hourly rates for cases involving mortgages and promissory notes to $250 for partners, $175 for associates, and $80 for paralegals." (citation omitted)).

Jason Nagi is a partner in New York, and Bradley Gardner, who was promoted to shareholder in 2018, practices in Kansas City. (Nagi Decl. ¶¶ 1-2; Ex. 3 to Nagi Decl.) They "specialize in commercial foreclosures and other real estate and financial instrument litigation in multiple jurisdictions across the country[.]" (Nagi Decl. ¶ 3.)

Associate Meredith Hoberock is based in Kansas City, graduated from law school in 2012, and assisted with the work in 2015 and 2016. (*Id.* ¶ 2; Ex. 3 to Nagi Decl.) Hoberock "assists financial institutions in structuring, documenting, negotiating and closing real estate, health care, nonprofit, asset-based and other commercial financing transactions." (Ex. 3 to Nagi Decl.) Associate Kelsey Hodgdon is also based in Kansas City, graduated from law school in 2018, is part of the Financial Services Litigation practice group, and assisted with the work in 2019. (Nagi Decl. ¶ 2; Ex. 3 to Nagi Decl.) Scott Seabaugh "assisted in financing issues related to the Lender's payment of over $233,000 in taxes." (Nagi Decl. ¶ 2.)[6] "Savanna Barlow is an associate in the Financial Services Litigation practice group[,]" graduate from law school in 2018, and is based in Dallas. (Ex. 3 to Nagi Decl.) "One paralegal was based out of Chicago and another in Kansas City to take advantage of the lower rates, and preformed necessary tasks, such as document organization, title work investigation and filings, so that attorneys could focus on legal issues." (Nagi Decl. ¶ 5.)

Although Plaintiff "made an effort to use attorneys and paralegals in the Midwest to take advantage of the lower rate structure," the requested rates are still above the hourly rates deemed

---

[6] Plaintiff has not provided the Court with information regarding the seniority level of any associate or biographical information for Scott Seabaugh or Brett Anders. As such, each associate is treated as a junior associate for purposes of determining appropriate hourly rates.

11

reasonable in mortgage foreclosure cases in this district. (*Id.* ¶ 2; *see* Pl. Mem. ¶ 21.)

The undersigned respectfully recommends that the hourly rate for partner Jason Nagi be reduced to $375; the hourly rate for Bradley Gardner be reduced to $250; the hourly rate for associates Meredith Hoberock, Scott Seabaugh, Kelsey Hodgdon, Brett Anders, and Savanna Barlow be reduced to $175; and the hourly rate for paralegals Trista Backus and Hannah Ball be reduced to $80.

| Partners | | |
|---|---|---|
| **Name** | **Requested Rate** | **Assigned Rate** |
| Jason Nagi | $475 | $375 |
| Bradley Gardner | $347 | $250 |

| Attorneys | | |
|---|---|---|
| **Name** | **Requested Rate** | **Assigned Rate** |
| Meredith Hoberock | $283 | $175 |
| Scott Seabaugh | $460 | $175 |
| Kelsey Hodgdon | $275 | $175 |
| Brett Anders | $485 | $175 |
| Savanna Barlow | $360 | $175 |

| Paralegals | | |
|---|---|---|
| **Name** | **Requested Rate** | **Assigned Rate** |
| Trista Backus | $162 | $80 |
| Hannah Ball | $185 | $80 |

(*See* Dkt. 54 at 2; Nagi Decl.)

**2. Reasonableness of Time Billed**

In addition to evaluating the reasonableness of the hourly rate sought, the Court must also consider whether the "number of hours for which compensation is sought is reasonable." *Monge v. Glen Cove Mansion Hosp.*, No. 18-CV-7229(SJF)(SIL), 2020 WL 1666460, at *7 (E.D.N.Y. Apr. 2, 2020) (quotation and citation omitted). The court has discretion to deduct hours that are "excessive, redundant, or otherwise unnecessary." *Id.* (quotation and citation omitted). If a fee application has "such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of

hours claimed 'as a practical means of trimming fat from a fee application[.]'" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (quoting *Carey*, 711 F.2d at 1146).

Plaintiff seeks reimbursement for time billed by partners, associates and paralegals. (Dkt. 54 at 2-3; Billing Records.) The partners billed a collective 254.4 hours. Nagi billed 167.2 hours for tasks including reviewing the master servicing agreement, reviewing custodial agreements, reviewing taxes and following up on tax lien issues, coordinating closing issues, preparing for and attending settlement, corresponding and following up with opposing counsel, and preparing for and attending court conferences. (*See, e.g.*, Billing Records entries dated May 6, 2016, May 9, 2016, June 3, 2016, June 20, 2016, July 18, 2016.) However, Nagi performed tasks that could have been performed by a paralegal or associate such as following up with the title company on service of process issues relating to the estates. (*See, e.g.*, Billing Records entries dated Sept. 7, 2016, Sept. 12, 2016, Sept. 14, 2016, Nov. 1, 2016.) Additionally, the undersigned is not able to determine what tasks Nagi billed in some instances because of heavy redactions. (*See, e.g.*, Billing Records entries dated Feb. 2, 2016, Feb. 9, 2016, Mar. 10, 2016, Apr. 1, 2016, Oct. 11, 2016, Oct. 12, 2016.) Accordingly, the undersigned respectfully recommends that Nagi's hours be reduced by 15%.

Gardner billed 87.2 hours on tasks including drafting the complaint for federal court, drafting motions, preparing for hearings, researching and drafting memorandums, and compiling receiver papers. (*See, e.g.*, Billing Records entries dated Mar. 21, 2017, Mar. 22, 2017, Apr. 26, 2017, July 20, 2018, Aug. 2, 2018, Sept. 5, 2018.) The undersigned concludes that these are appropriate tasks for a partner and lead attorney to perform and that Gardner spent a reasonable amount of time on them.

The associates collectively billed 75.2 hours on tasks including reviewing the case file and instructing paralegals on compiling service affidavits, drafting motions, reviewing loan document package, corresponding with the title company, review tax lien, managing discovery requests, and corresponding with the client. (*See, e.g.*, Billing Records entries dated Dec. 22, 2015, Dec. 28, 2015,

13

Jan. 29, 2016, Mar. 3, 2016, Mar. 29, 2016, Apr. 13, 2016, Oct. 19, 2016, Nov. 15, 2016, Nov. 17, 2016.) The undersigned concludes that these are appropriate tasks for associates to perform and that associates spent a reasonable amount of time on them. However, the undersigned is not able to determine what tasks Hoberock and Anders billed in some instances because of heavy redactions. (*See, e.g.*, Billing Records entries dated Jan. 14, 2016, Aug. 16, 2016, Sept. 7, 2016, Oct. 11, 2016.) Accordingly, the undersigned respectfully recommends that the associates combined hours be reduced by 15%.

The paralegals billed a collective 55.2 hours on tasks including researching and performing administrative tasks relating to service attempts, changing the case caption and organizing and compiling documents and motions to electronically file with the court. (*See, e.g.*, Billing Records entries dated Feb. 9, 2016, Feb. 27, 2017, Aug. 14, 2018, Aug. 16, 2018, Aug. 20, 2018, Sept. 5, 2018, Sept. 11, 2018, Aug. 14, 2019.) The undersigned concludes that these are appropriate tasks for a paralegal to perform and that the paralegal spent a reasonable amount of time on them. *See Barile v. Allied Interstate, Inc.*, No. 12-CV-916 (LAP)(DF), 2013 WL 795649, at *21 (S.D.N.Y. Jan. 30, 2013) (stating that "preparing a notice of motion, changing captions, and e-filing" are compensable paralegal tasks), *R&R adopted*, 2013 WL 829189 (S.D.N.Y. Mar. 4, 2013).

| Partners | | | | | |
|---|---|---|---|---|---|
| **Name** | **Date Range** | **Hours Billed** | **Adjusted Hours** | **Hourly Rate** | **Lodestar Amount** |
| Jason Nagi | Dec. 21, 2015 to Feb. 28, 2020 | 167.2 | 142.12 | $375 | $53,295.00 |
| Bradley Gardner | Feb. 2, 2017 to Aug. 26, 2019 | 87.2 | 87.2 | $250 | $21,800.00 |

| Associates | | | | | |
|---|---|---|---|---|---|
| **Name** | **Date Range** | **Hours Billed** | **Adjusted Hours** | **Hourly Rate** | **Lodestar Amount** |
| Meredith Hoberock | Dec. 22, 2015 to Feb. 2, 2017 | 61.3 | 52.1 | $175 | $9,117.50 |
| Scott Seabaugh | Feb. 26, 2016 to May 3, 2016 | 9.2 | 7.82 | $175 | $1,368.50 |

14

| Kelsey Hodgdon | May 31, 2019 to June 21, 2019 | 2.3 | 1.96 | $175 | $343.00 |
| Brett Anders | Aug. 16, 2016 | 0.20 | .17 | $175 | $29.75 |
| Savanna Barlow | Nov. 26, 2019 | 2.2 | 1.87 | $175 | $327.25 |

| Paralegals | | | | | |
| --- | --- | --- | --- | --- | --- |
| Name | Date Range | Hours Billed | Adjusted Hours | Hourly Rate | Lodestar Amount |
| Trista Backus | Feb. 27, 2017 to Sept. 9, 2019 | 47.4 | 47.4 | $80 | $3,792.00 |
| Hannah Ball | Dec. 23, 2015 to Aug. 29, 2016 | 7.8 | 7.8 | $80 | $624.00 |

Accordingly, the amount due for reasonable attorneys' fees is **$90,697.00**.

### 3. Interest on Legal Advances

Plaintiff requests interest on the attorneys' fees at a rate of 9%. (Goldwasser Decl. ¶ 6(d).) In support, Plaintiff submitted a summary for "Professional Services Through February 29, 2020," which shows that, as of March 19, 2020, Plaintiff advanced the full amount of $3,674.29 in costs and a partial payment of $114,827.32 in attorneys' fees, totaling $118,501.61. (*See* Billing Records.) Plaintiff provided an affidavit that it made payments to counsel on June 27, 2016, March 17, 2017, November 8, 2017, December 28, 2017, April 30, 2018, and October 31, 2018, totaling $118,501.61. (Goldwasser Decl. ¶ 6(d).) However, Plaintiff sent notice to Defendants on March 9, 2020, inconsistently stating that Plaintiff paid advances for legal fees on January 25, 2016, November 1, 2017, July 17, 2018, and October 31, 2018, totaling $127,509.32. (Dkt. 54-4 at 2.)

In order for the Court to calculate interest on legal advances it paid, Plaintiff must provide clear dates and amounts paid. Plaintiff has provided information showing not only inconsistent amounts paid, but also inconsistent dates on which payments were purportedly made.

Accordingly, the undersigned respectfully recommends that no interest be awarded on legal advances.

### 4. Unbilled Work

Plaintiff requests an award of $14,460.00 for "Unbilled Work Through March 27, 2020." (Billing Records at 20), the undersigned finds it unreasonable to recover attorneys' fees for unspecified future work without documentation that it was actually performed. Plaintiff did not provide supplemental billing records for any work done after February 28, 2020. (*See* Billing Records.) The requirement to submit contemporaneous billing records to show hours worked is "a strict rule from which attorneys may deviate only in the rarest of cases[,]" such as records being rendered unavailable by fire or computer malfunction. *Scott,* 626 F.3d at 133, 134.

Accordingly, the undersigned respectfully recommends that the Court not award any amount for unbilled legal work.

### 5. Reasonable Costs

Plaintiffs seek $3,674.29 in reimbursement for costs including travel, service processers, filing gees, and deliveries of invoices. (*See* Billing Records at 57-61.) Plaintiff provided details of these amounts and the undersigned concludes that these costs are reasonable. *See Ethelberth v. Choice Sec. Co.*, No. 12-CV-4856 (PKC)(VMS), 2016 U.S. Dist. LEXIS 104417, at *39-40 (E.D.N.Y. Aug. 5, 2016), *R&R adopted*, 2016 U.S. Dist. LEXIS 114131 (E.D.N.Y. Aug, 23, 2016).

## II. Defendants' Arguments

Despite their default, Defendants were granted leave to submit filings regarding damages. The Court has reviewed Defendants' submissions in furtherance of the Court's obligation to ensure damages are appropriate. *See, e.g.*, *Transatlantic Marine Claims Agency v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (noting the district court had an "obligation to ensure that the damages were appropriate"); *Stark Carpet Corp. v. Stark Carpet & Flooring Installations, Corp.*, 954 F. Supp. 2d 145, 151 (E.D.N.Y. 2013) ("Although courts considering motions for default judgment are entitled to accept as true all well-pleaded facts in a complaint pertaining to liability, courts have an 'obligation to ensure

16

that damages [a]re appropriate."' (citation omitted)).

Defendants argue that the Court should reduce the amount of attorneys' fees and accrued interest because they are "solely attributable to Plaintiff (or, possibly, predecessors-in-interest) resulting from Plaintiff's failed efforts for years through absolutely no fault of Defendants." (Dkt. 43 at 2.) Specifically, Defendants contend that Plaintiff should not recover attorneys' fees "for numerous hours of work prior to the commencement of this action which accomplished nothing productive whatsoever in the prior action." (*Id.*) They also argue that the Court should exercise its equitable powers and reduce the amount of interest due to "lengthy, unexplained delays by [P]laintiff." (Dkt. 44 (quoting *U.S. Bank, N.A. v. Peralta*, 142 N.Y.S.3d 568 (N.Y. App. Div. 2021) [hereinafter *Peralta*].)

Plaintiff requests attorneys' fees for work beginning on December 21, 2015. At that point, Burnell's had failed to make its regular principal and interest payment starting on April 15, 2015, and Plaintiff had filed the first foreclosure action in Queens County Supreme Court. Under the Note and CEMA, Plaintiff is entitled to recover reasonable attorneys' fees for commencing foreclosure proceedings to enforce its rights. (Note, Art. 17; CEMA, Section 18.2.) When the state court case was dismissed without prejudice (Nagi Decl. ¶ 9(m), n.4), Plaintiff filed the Complaint in this Court on June 14, 2018.

Defendants provide no support for their contention that attorneys' fees should only be calculated on the basis of legal work done in this action rather than in the totality of Plaintiff's efforts to foreclose on the Properties. The Note and CEMA do not limit the recovery of attorneys' fees to a single attempt at foreclosure, and Defendants do not explain how Plaintiff's actions in either case were improper.

Defendants also do not show that the seven-year delay in bringing this foreclosure action to completion was attributable to Plaintiff. Unlike in *Peralta*, where the plaintiff delayed 64 months before moving to vacate the prior order of reference and for a new order of reference, and delayed another 19

17

months after a bankruptcy stay was lifted before moving for leave to file a late notice of sale and for an extension of time to sell the premises, *Peralta*, 142 N.Y.S.3d 568, Plaintiff has diligently sought to enforce its rights, first in state court and then in federal court. Courts which have exercised their equitable powers to reduce interest amounts have done so because of inaction by plaintiffs and a concern that a plaintiff may be "biding its time and watching interest accrue[.]" *WBCMT 2003-C9 Island Living, L.L.C. v. Swan Creek Ltd. P'ship*, No. 14-cv-14243 (MFL), 2017 WL 4778735 (E.D. Mich. 2017); *see, e.g., Greenpoint Mtge. Corp. v. Lamberti*, 66 N.Y.S.3d 32, 34 (N.Y. App. Div. 2017) (lender took no action for three years after filing foreclosure case).

Defendants argue that "[e]ven if Plaintiff 'did not cause this delay, it should not benefit financially, in the form of accrued interest' because this delay is not attributable to Defendants whatsoever." (Dkt. 43 at 1 (quoting *Greenpoint*, 66 N.Y.S.3d at 34).) However, Defendants have not shown how awarding the full amount of accrued interest would be inequitable beyond the possibility that, after satisfaction of the judgment in this case, there may not be any surplus funds from the proceeds of the sale of the Properties to be distributed to Defendants. (*See* Dkt. 43 at 2.) Plaintiff contends that Defendants contributed to the delay through its actions in the state court action, including "refus[ing] to consent to the [case] caption being amended to add Plaintiff," despite having agreed to do so. (Dkt. 45 at 2.) It also points out that Defendants have benefited from delay in this case by collecting rents on the properties during the pendency of the foreclosure proceedings. (*Id.*) The record does not contain evidence to the contrary.

Accordingly, the undersigned respectfully recommends that this Court decline to exercise its equitable power to reduce the amount of accrued interest.

## **CONCLUSION**

For the foregoing reasons, the undersigned respectfully recommends that the Motion be granted in part and that Plaintiff be awarded the following amounts, including interest up to and

18

including May 13, 2022:

1. Unpaid principal in the amount of $725,171.58 and interest of $1,629,669.15 (per diem rate of $476.83);

2. Advances for tax and water payments of $498,415.17 and interest of $426,744.90 (per diem rate of $327.73);

3. Advances for insurance payments of $21,340.12 and interest of $4,188.51 (per diem rate of $5.26);

4. Prepayment charge of 1% of the unpaid principal: $7,251.72.

5. Attorneys' fees of $90,697.00; and

6. Costs of $3,674.29.

The total amount of the deficiency judgment as of May 13, 2022 is $3,407,152.44. The combined per diem interest rate is $809.82 until full payment is made.

Plaintiff is directed to serve this Report and Recommendation on Defendants forthwith and file proof of service on the docket by May 20, 2022.

Any objection to this Report must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to timely file any objection waives the right to further judicial review of this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

                                                  **SO ORDERED:**

                                                  *Peggy Kuo*

                                                  PEGGY KUO
                                                  United States Magistrate Judge

Dated:   Brooklyn, New York
           May 13, 2022